Argued and submitted April 13, reversed and remanded December 21, 2011

D. T.,
*Petitioner,*

*v.*

DEPARTMENT OF HUMAN SERVICES,
*Respondent.*

Office of Administrative Hearings
20100200; A145182

269 P3d 96

Beth Englander argued the cause for petitioner. With her on the brief was Disability Rights Oregon.

Douglas F. Zier, Assistant Attorney General, argued the cause for respondent. With him on the brief were John R. Kroger, Attorney General, and Mary H. Williams, Solicitor General.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Nakamoto, Judge.

WOLLHEIM, J.

## WOLLHEIM, J.

Petitioner, a patient at the Oregon State Hospital, seeks judicial review of an administrative order entered following a contested case hearing authorizing the hospital to forcibly medicate him with multiple psychotropic drugs. Petitioner argues that the order should be reversed because the Department of Human Services, the agency operating the hospital, (1) did not rebut the presumption that petitioner is competent to make treatment decisions for himself, and (2) did not demonstrate that the hospital had considered all less intrusive alternatives to involuntary medication—in particular, the alternative of returning petitioner to the maximum security ward where his symptoms had been managed without psychotropic drugs. We agree with petitioner on the latter point, and we therefore reverse and remand the order.

We take the facts from the unchallenged findings in the final agency order, and the undisputed evidence in the record.[1] In 2007, petitioner, then 48 years old, assaulted his sister in a home they shared with their mother. According to a police report of the incident, petitioner became agitated when his sister was making noise while he was watching television. Petitioner eventually chased his sister to the driveway of the house, where he repeatedly punched her in the head and slammed her head into concrete. He was arrested and charged with assault.

Petitioner was deemed unable to aid and assist in his defense, and he was twice admitted to the Oregon State Hospital for "restoration of competency." During his time at the hospital, petitioner lived on ward 48C, one of its maximum security wards. His discharge summary for that pretrial period, dated January 6, 2009, indicated that petitioner "did fair in the milieu. He did not require seclusion or restraint and never expressed thoughts of harming himself or others." His "condition at discharge" was "[s]table; though continues with cognitive dysfunction including limited executive functioning, poor memory, and an isolated delusion."

---

[1] After the hospital notified petitioner of its intent to medicate him without his informed consent, he requested a hearing. The hospital referred the request to the Office of Administrative Hearings. The hearing was conducted, and the final order in this case was issued, by an administrative law judge from that office.

That "isolated delusion" was the "idea that he was exposed to ether when he used a friend's toothbrush years ago," and that the "ether has remained in his system and is contributing to his physical ailments."

Dr. Lockey, who conducted an assessment in January 2009, opined that, at that time, petitioner's "delusional thoughts are fairly isolated and are not negatively impacting his life to a significant extent at this point." Because the delusions were not "impacting his day-to-day functioning," petitioner was not treated with antipsychotic or antidepressant medications; "[t]he cognitive impact would have likely been more negative than the benefits he may have had from these treatments." Nonetheless, Lockey noted, "At some point in the future if his delusional thoughts get significantly worse, he may benefit from an antipsychotic medication or selective serotonin inhibitor (shown to help with somatic delusions[2])."

After being found able to aid and assist in his defense, petitioner, with the assistance of counsel, pleaded guilty except for insanity. As a result of the plea, petitioner was placed under the jurisdiction of the Psychiatric Security Review Board (PSRB) for up to 10 years and was readmitted in March 2009 to the Oregon State Hospital. Upon arriving at the hospital, petitioner was again housed in a maximum security ward, 48B.

While on the 48 wards—that is, before his plea and then later at the beginning of the period of his commitment to PSRB jurisdiction—the three psychiatrists who evaluated petitioner, Drs. Lockey, Duran, and Lagattuta, had not recommended treatment with psychotropic medication. In fact, when petitioner was first admitted to the hospital, there was some question as to whether he even suffered from a psychotic disorder. Petitioner had suffered a brain injury as the result of a motorcycle accident when he was younger and had spent several weeks in a coma. Lagattuta, who conducted petitioner's initial psychology assessment shortly after his plea, concluded that his "primary psychiatric problem seems to be the cognitive deficits caused by the aforementioned

---

[2] A "somatic delusion" is a delusion "having reference to a nonexistent lesion or alteration of some organ or part of the body; sometimes indistinguishable from hypochondriasis." *Stedman's Medical Dictionary* 471 (27th ed 2000).

head injury that the patient experienced." Although petitioner "appear[ed] to manifest some thought content that falls into the category of overvalued ideas (if not delusions)," Lagattuta was of the view that "[i]t is likely that this thought content is part of the constellation of symptoms related to his head injury. *It does not appear that a separate diagnosis of a psychotic disorder is warranted at this time.*" (Emphasis added.) Among his recommendations, Lagattuta listed, "Psychopharmacological treatment should be considered for the patient's cognitive problems (including his possible delusional thought content)."

In May 2009, three months after readmission to the hospital, petitioner was transferred to a lower security ward, 50G. The undisputed evidence is that ward 50G is a more chaotic environment than the maximum security wards; ward 50G is overcrowded and has fewer staff per patient than wards 48B and 48C, where petitioner had resided. Upon being transferred, petitioner became "very angry and nonresponsive to redirection from institution staff." Petitioner's behavior "became so out of control that the institution restrained and secluded him."

In July 2009, petitioner was assigned a new treating psychiatrist, Dr. Sethi. Almost immediately thereafter, petitioner and Sethi disagreed over the subject of psychotropic medication. In his notes from July 16, 2009, Sethi wrote:

"[Petitioner] refuses to discuss or consider psychotropic medications. He denies any responsibility for his verbal abuse [and] outbursts. I will consider the possibility of initiating the process of involuntary meds. [Petitioner] will probably benefit from a combination of a mood stabilizer [and] an antipsychotic."

Over the next several months, petitioner's behavior on ward 50G worsened. He had intense verbal outbursts in which he threatened to become violent; he also expressed feelings of being persecuted by staff and fellow patients. According to Sethi's September 2009 notes, petitioner denied being mentally ill, demanded to be discharged, and threatened physical violence.

In November 2009, petitioner was involved in an incident with another patient that escalated to the point that

petitioner "aggressively postured and threatened staff with physical injury and death." He was "so angry, out of control and non-responsive to directions that he needed to be medicated, restrained and secluded." Petitioner received an emergency involuntary dose of olanzapine, an antipsychotic drug, and his behavior improved after the drug was administered. As a result of that incident, petitioner was transferred back to ward 48B, one of the maximum security wards.

Six weeks later, petitioner was moved back to ward 50G, at which point Sethi attempted to provide petitioner information regarding psychotropic medication. Petitioner became angry and repeatedly denied having a mental illness or needing the proposed medication. On January 5, 2010, a medication educator, Lubben, provided petitioner with information on a number of drugs, including aripiprazole, ziprasidone, risperidone, risperidone consta, clonazepam, lorazepam, divalproex, and lithium. Two days later, Dr. Jew, an independent consulting psychiatrist, discussed those psychotropic medications with petitioner. Again, petitioner stated that he was not mentally ill, that he did not need the proposed medications, and that he was scared of the medications, particularly the potential side effects. According to Jew's chart notes, petitioner "identified the risks of seizures and 'other problems' as potential risks" and "identified no benefits." Petitioner stated that "there are no risks of receiving no treatment," and that there was "nothing wrong" with him.

On January 14, petitioner was notified that the Chief Medical Officer at the hospital had approved a proposal for administering a "significant procedure" without petitioner's consent—namely, administering aripiprazole, ziprasidone, risperidone, risperidone consta, clonazepam, lorazepam, divalproex, and lithium.[3] Five days later, petitioner had another incident involving aggressive posturing

---

[3] The hospital provided petitioner with a description, including potential side effects, of each medication that the hospital intended to administer. Potential side effects ranged from dizziness, blurred vision, sleep problems, nausea, constipation, lack of balance and coordination, to more severe side effects such as sudden and severe stomach pain, trouble breathing, unusual bruising, tremors, chest pain, fainting, confusion, loss of muscle control, and hallucinations.

and threats toward staff, and petitioner was again administered emergency involuntary doses of olanzapine.

After receiving notice that he would be medicated without consent, petitioner requested a hearing to challenge the hospital's decision. The hospital referred the request to the Office of Administrative Hearings, and an administrative law judge (ALJ) from that office conducted a hearing. The issues at the hearing concerned the interpretation and application of an administrative rule, OAR 309-114-0020, which provides an exception to the basic rule that state hospital patients "may refuse any significant procedure," OAR 309-114-0010(1). The exception allows an institution like the Oregon State Hospital to administer a "significant procedure," such as psychotropic medication,[4] without the patient's informed consent only for "good cause," which involves a four-part test:

"['Good cause'] exists to administer a significant procedure to a person committed to the Division without informed consent if in the opinion of the treating physician or psychiatric nurse practitioner after consultation with the treatment team the following factors are satisfied:

"(a) *Pursuant to OAR 309-114-0010(2), the person is deemed unable to consent to, refuse, withhold or withdraw consent to the significant procedure.* This determination must be documented in the treating physician's or psychiatric nurse practitioner's informed consent form and the independent examining physician's evaluation form, and include the specific questions asked and answers given regarding the patient's ability to weigh the risks and benefits of the proposed treatment, alternative treatment, and no treatment, including but not limited to all relevant factors listed in 309-114-0010(3)(a).

"(b) *The proposed significant procedure will likely restore, or prevent deterioration of, the person's mental or physical health; alleviate extreme suffering; or save or extend the person's life.* * * *

---

[4] *See* OAR 309-114-0005(13) (" 'Significant Procedure' means a diagnostic or treatment modality, and all significant procedures of a similar class that pose a material risk of substantial pain or harm to the patient such as, but not limited to, *psychotropic medication* * * *." (Emphasis added.)).

"(c) *The proposed significant procedure is the most appropriate treatment for the person's condition according to current clinical practice, and all other less intrusive procedures have been considered and all criteria and information set forth in OAR 309-114-0010(3)(a) were considered.* This factor is established conclusively for purposes of a hearing under [OAR] 309-114-0025 by introducing into evidence the treating physician's or psychiatric nurse practitioner's informed consent form and the independent examining physician's evaluation form, unless this factor is affirmatively raised as an issue by the patient or his or her representative at the hearing.

"(d) *The institution made a conscientious effort to obtain informed consent from the patient.* \* \* \*""

OAR 309-114-0020(1) (emphasis added).

At the hearing, petitioner challenged the hospital's proof on three of the four factors: (a) (whether, pursuant to OAR 309-114-0010, he is unable to consent to the significant procedure), (b) (whether the proposed medication "will likely restore, or prevent deterioration of, the person's mental or physical health," OAR 309-114-0020(1)(b)), and (c) (whether "all other less intrusive procedures have been considered," OAR 309-114-0020(1)(c)). With respect to the first factor, OAR 309-114-0010 provides, in part:

"(2) Capacity of the patient: In order to consent to, or refuse, withhold, or withdraw consent to significant procedures, *the patient must have the capacity to make a decision concerning acceptance or rejection of a significant procedure,* as follows:

"(a) Unless adjudicated legally incapacitated for all purposes or for the specific purpose of making treatment decisions, *a patient shall be presumed competent to consent to, or refuse, withhold, or withdraw consent to significant procedures.* A person committed to the Division may be deemed unable to consent to or refuse, withhold, or withdraw consent to a significant procedure *only if the person currently demonstrates an inability to reasonably comprehend and weigh the risks and benefits of the proposed procedure, alternative procedures, or no treatment at all including, but not limited to, all applicable factors listed in (3)(a) of this rule.* The patient's current inability to provide informed

consent is to be documented in the patient's record and supported by the patient's statements or behavior; and may be evidenced in the treating physician's or psychiatric nurse practitioner's informed consent form, the evaluation form by the independent examining physician and forms approving or disapproving the procedure by the superintendent or chief medical officer;

"(b) A person committed to the Division shall not be deemed unable to consent to or refuse, withhold, or withdraw consent to a significant procedure *merely by reason of one or more of the following facts*:

"(A) The person has been involuntarily committed to the Division;

"(B) The person has been diagnosed as mentally ill;

"(C) *The person has disagreed or now disagrees with the treating physician's or psychiatric nurse practitioner's diagnosis*; or

"(D) *The person has disagreed or now disagrees with the treating physician's or psychiatric nurse practitioner's recommendation regarding treatment*."

(Emphasis added.)

The ALJ ultimately concluded that the hospital had proved each of the disputed factors. As to the first factor, the ALJ concluded that petitioner "claims to be merely verbally belligerent and not a physical threat to others. His aggressive and violent actions in May 2009, November 2009 and January 2010 indicate otherwise." The ALJ continued,

"[Petitioner] believes that the proposed medications would have no benefits for him. However, taking the proposed medications will reduce [his] delusions, paranoia, aggression and violence. Further, taking the proposed medications would likely improve [his] condition to an extent that he could leave the institution. Without the proposed medications, [petitioner] would continue to have increased symptoms, including delusions, aggression and paranoia. *Because [petitioner] does not grasp that his behaviors are*

*symptoms of his mental illness, he cannot reasonably com-*
*prehend or weigh the risks and benefits associated with tak-*
*ing the proposed medications. Thus, I conclude that [peti-*
*tioner] lacks capacity to give or withhold his informed*
*consent."*

(Emphasis added.)

With respect to the second factor, the ALJ found that the "proposed medications will abate [petitioner's] delusions and blunt his explosive outbursts"—benefits that, in turn, would "preserve his physical health." Thus, the ALJ concluded that "the institution has established the requirements of OAR 309-114-0020(1)(b)."

As to the third factor—whether the hospital considered "all other less intrusive procedures"—the ALJ reasoned that "the rule cited does not require that other, less-intrusive treatment modalities be tried, but only considered." Relying on Sethi's testimony that only medication intervention would allow petitioner to benefit from less-intrusive treatment modalities, the ALJ concluded "that the institution has met the criteria of OAR 309-114-0020(1)(c)."

Because petitioner did not challenge the hospital's proof on the final factor (whether the hospital made a conscientious effort to obtain informed consent), the ALJ concluded that the hospital had satisfied each of the requirements of the rule and affirmed the hospital's decision to administer the psychotropic medication without petitioner's informed consent.

On judicial review, petitioner challenges two aspects of the ALJ's order: (1) the conclusion regarding his capacity to consent or refuse consent to psychotropic medication, and (2) the conclusion that the hospital had considered "all other less intrusive" alternatives to forced medication. We take each in turn.

In his first assignment of error, petitioner argues that the ALJ "failed to apply the standard required by OAR 309-114-0010(2) to determine whether good cause existed to forcibly medicate [petitioner] with psychotropic drugs." Petitioner argues that the ALJ skipped the required analysis for

determining whether he was able to consent to the medication—that is, whether petitioner "currently demonstrates an inability to reasonably comprehend and weigh the risks and benefits of the proposed procedure, alternative procedures, or no treatment at all * * *." *Id.* Instead, petitioner argues, the ALJ deemed him unable to consent based "merely" on the fact he disagreed with his treating physician's diagnosis, which, under OAR 309-114-0010(2)(b)(B), is expressly *not* a basis for deeming a patient unable to consent.

DHS reads the ALJ's order differently. According to DHS, the order is not based "merely" on the fact that petitioner disagreed with the diagnosis, but rather, the order is based on substantial evidence that petitioner was *unable to grasp that diagnosis.* We agree with DHS.

As set out above, OAR 309-114-0010(2)(b) provides that a person committed to the state hospital shall not be deemed unable to consent to or refuse, withhold, or withdraw consent to a significant procedure "*merely* by reason of one or more of" certain enumerated facts, including the fact that "[t]he person disagrees with the treating physician's * * * diagnosis." (Emphasis added.) The ALJ, however, did not look merely to the fact that petitioner disagreed with Sethi's diagnosis. Rather, the ALJ determined that, "because [petitioner] does not grasp that his behaviors are symptoms of his mental illness, he cannot reasonably comprehend or weigh the risks and benefits associated with taking the proposed medications." There is a significant distinction between "disagreeing" with a diagnosis, on the one hand, and being unable to grasp the diagnosis, on the other. OAR 309-114-0010(2)(b) prohibits a "good cause" determination based on the former; it does not, however, preclude such a determination in the latter situation.

To the contrary, under OAR 309-114-0010(2)(a), a person is deemed unable to consent to significant medical procedures if the person is unable to "reasonably comprehend and weigh the risks and benefits of the proposed procedure, alternative procedures, or no treatment at all * * *." There is sufficient evidence in the record to support the ALJ's determination that petitioner cannot grasp the nature of his illness—specifically, evidence that petitioner believes that

there is "nothing wrong" with him; that he minimizes his danger to others, including his past violence; and that, despite his delusions and outbursts, petitioner nonetheless believes that there are no benefits to the proposed medication and no downside to not taking them, because his symptoms are not the product of a mental disorder. Although petitioner points to evidence that he understands and harbors concerns about potential side effects of the psychotropic medication, the question before us is not whether some of petitioner's concerns are legitimate or rational; the question before this court is whether, viewing the evidence as a whole, a reasonable person could find that petitioner lacked the ability to comprehend and weigh the risks and benefits of the proposed procedure, alternative procedures, or no treatment at all. ORS 183.482(8)(c). There is evidence that petitioner simply is unable to reasonably comprehend the symptoms of his illness, thereby making it impossible for him to weigh the risks and benefits of the proposed medical procedure. For that reason, we reject petitioner's argument regarding the agency's determination that he is unable to consent to the proposed medications.[5]

In his second assignment of error, petitioner contends that DHS failed to demonstrate that the hospital considered "all other less intrusive" alternative procedures to forced medication, OAR 309-114-0020(1)(c), and that the order is therefore not supported by substantial evidence or substantial reason. For the reasons that follow, we agree that the order is not supported by substantial evidence, and we therefore reverse and remand.

"Good cause" to administer a significant procedure exists only if "[t]he proposed significant procedure is the most

---

[5] Relatedly, petitioner suggests that the order is not supported by substantial reason because it does not expressly evaluate "the many statements made by [petitioner] explaining his understanding of the risks and benefits of his treatment options, and the agency did not evaluate how [petitioner] weighed those risks and benefits and decided to refuse the psychotropic medications." The "substantial reason" test does not require an agency to expressly reject each of a petitioner's arguments or recount all the evidence that the agency considered; rather, it requires that an agency adequately explain "the *reasoning* that leads * * * from the *facts* that it has found to the *conclusions* that it draws from those facts." *Drew v. PSRB,* 322 Or 491, 500, 909 P2d 1211 (1996) (emphasis in original). The order in this case meets that standard.

appropriate treatment for the person's condition according to current clinical practice, *and all other less intrusive procedures have been considered * * *.*" OAR 309-114-0020(1)(c) (emphasis added). Under that administrative rule,

> "this factor is established conclusively for purposes of a hearing under [OAR] 309-114-0025 by introducing into evidence the treating physician's or psychiatric nurse practitioner's informed consent form and the independent examining physician's evaluation form, unless this factor is affirmatively raised as an issue by the patient or his or her representative at the hearing."

At the hearing before the ALJ, petitioner affirmatively raised the issue whether the hospital had, in fact, considered all less intrusive procedures. Petitioner offered undisputed evidence that his mental health issues had been managed without psychotropic medication on the less crowded, more structured maximum security wards of the hospital. Petitioner argued, as the ALJ characterized it in the final order, "that, after nearly two years of interaction with the institution without psychotropic medication, the institution cannot come at this late date to pursue the proposed medications. Finally, he assert[ed] that the institution ha[d] not tried other, less intrusive treatment modalities before attempting to administer the proposed medications."

As to that last contention, the ALJ reasoned:

> "Finally, the rule cited does not require that other, less-intrusive treatment modalities be tried, but only considered. *Dr. Sethi opined that less-intrusive treatment modalities would not abate [petitioner's] delusional symptoms and explosive outbursts. He further stated that only medication intervention will allow [petitioner] the opportunity to benefit from those less-intrusive treatment modalities.* Thus, I conclude that the institution has met the criteria of OAR 309-114-0020(1)(c)."

(Emphasis added.)

Because the ALJ based her decision exclusively on Sethi's testimony, we quote that testimony at length. Sethi was asked, by the hospital's representative at the hearing, "And did you consider all other less intrusive procedures?" He responded:

"We have made every effort to get [petitioner] involved in treatment including engaging him in a treatment in eating, addressing his pain issues. He was refusing to attend his groups, uh, because of the pain. The pain, by his admission is about 70 percent better. We have—I have bent over backwards in the last seven months to get him involved in treatment. He said he couldn't read. We gave him big font medication information. He said he was reading through that. He turned down my offer saying he couldn't focus and concentrate for that long. And in my notes I have mentioned that I will continue working with him and his mother to foster a therapeutic relationship so we can convince him to be actively involved. The process for involuntary medication wasn't—wasn't a thoughtless decision. It took us about—it took me about seven months of trying to work with [petitioner] before deciding that he was unsafe and I couldn't let this procedure stand in the way of appropriate treatment, especially if he's looking at getting discharged from under PSRB jurisdiction or out of the State Hospital. Without medication his behavior will continue and that goal would not be achieved. So, I'm trying to get him to his goal of getting out of the hospital but in a way which is appropriate and which doesn't involve him making threats against me or the hospital staff to get him out of the hospital."

(Emphasis added.) Later, Sethi was asked, "[I]f he takes the medications that you're proposing for him to do—do you think he'll be better able to take advantage of alternatives like group therapy and other therapies?" He answered:

"We have been hoping that if his delusional beliefs go down he will be able to participate and tolerate being in a structured setting with other people and take advantage of the 50 building more. I'm also hoping that if his agitation, paranoia, irritability go down he will receive a higher quality of medical care just by his ability to cooperate with the medical providers. So, I'm hoping all those alternatives will start plugging in, once—once we get[ ] the delusional beliefs resolved."

It is apparent from Sethi's testimony that each of the alternative treatments that were considered involved petitioner staying in the lower-security 50 ward. That is, there is no evidence that Sethi considered treating petitioner in a less chaotic environment such as the maximum security 48 wards. In fact, Sethi's answer to another question—whether

petitioner "will likely improve without taking psychotropic medications"—demonstrates that treatment on a more secure ward was not among the contemplated alternatives. In response to that question, he explained:

> "It is unlikely. He has had these beliefs since we first saw him in 2008. He was here for two admissions for competency restoration. Those beliefs have continued in the last seven months that I have seen him. If anything, in the last few weeks, uh, his anger and aggression has worsened. So there is more of an urgency to get it managed and treated. *It doesn't look good on any patient's record with the PSRB or risk review panel that they have to be what is called reverse transferred to the maximum security unit.* That only happens if there is—you know, there's a very high threshold for the board's transferring anyone and I think [petitioner] achieved that in November. *I was afraid with this recent outburst in January we would be looking at, again, getting him out to a maximum security.*"

(Emphasis added.) In other words, the evidence in the record is that Sethi's working assumption was that, if petitioner were to be moved to a maximum security ward, it would be frowned upon by the PSRB and hurt petitioner's chances of being released, and Sethi therefore did not even consider the alternative of treatment in that more secure environment.

We are not aware of—and DHS has not directed us to—any rule or statute that would disqualify from consideration a treatment option that might be disfavored during a PSRB review process. To the contrary, OAR 309-114-0020(1)(c) requires that "all" other less intrusive procedures be considered. The rule recognizes the gravity of forcibly imposing treatment modalities that risk substantial pain or harm to the patient, and require that those treatments be undertaken only as a last resort. The descriptions of the medications do, in fact, demonstrate the risk of harm to petitioner from being involuntarily forced to take the medications. The burden imposed by the rule, no matter how onerous, at the very least requires DHS to address whether the hospital considered a less intrusive alternative treatment modality such as placement and treatment on a maximum-security ward that "is affirmatively raised as an issue by the patient or his

or her representative at the hearing." OAR 309-114-0020(1)(c).

Petitioner raised the alternative of treatment in a less chaotic, more structured ward and presented evidence that he had, in fact, been treated in that environment without the use of psychotropic medication. DHS, in response, did not offer any evidence that the hospital had considered and rejected that option; rather, the record demonstrates that only alternative treatments in the lower-security wards were considered. Because there is no evidence that the hospital considered the less intrusive alternative of treating petitioner in a more secure and structured environment without psychotropic medication, the ALJ's conclusion "that the institution has met the criteria of OAR 309-114-0020(1)(c)" is not supported by substantial evidence in the record. We therefore reverse and remand the order.

Reversed and remanded.