470          October 29, 2025          No. 934

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

In the Matter of Marijuana Processor License No.
1003825DB95 held by:

ANWORTH, INC.;
Devan Anthony, Pres/Dir/Stkhldr;
and Sally Alworth, Sec/Dir/Stkhldr,
dba Luminous Botanicals,
*Petitioners,*

*v.*

OREGON LIQUOR AND CANNABIS COMMISSION,
*Respondent.*

Oregon Liquor and Cannabis Commission
2019MJM001;
A177206

Argued and submitted January 9, 2024.

Kevin J. Jacoby argued the cause for petitioners. Also on the opening brief were Andrew DeWeese and Green Light Law Group. Also on the reply brief was Jacoby Law.

Peenesh Shah, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Ortega, Presiding Judge, Powers, Judge, and Hellman, Judge.

ORTEGA, P. J.

Affirmed.

**ORTEGA, P. J.**

On judicial review of an administrative contested case, ORS 183.482, petitioners challenge an order of the Oregon Liquor and Cannabis Commission (OLCC) that denied petitioners' label application and imposed a penalty of $100,000 for transferring marijuana items for sale that had unapproved labels. On appeal, petitioners raise four assignments of error. We first reject petitioners' procedural challenge to the order, because any error was invited. As to the denial of petitioners' label application and the label violations, we conclude that OLCC's interpretations of the applicable rules are plausible and thus due deference and further conclude that OLCC's final order is supported by substantial reason. Finally, as to the penalty amount, we reject petitioners' contention that OLCC was not authorized by statute to assess a penalty per marijuana item transferred with an unapproved label. Accordingly, we affirm.

## I.   BACKGROUND

We briefly set out background facts and OLCC's ultimate conclusions from its final order below. We discuss in more detail aspects of that final order in our analysis of petitioners' specific assignments of error.

Petitioner Anworth is an Oregon corporation doing business as Luminous Botanicals and holds a marijuana recreational processor license. Petitioners Anthony and Alworth comprise Anworth's board of directors and stockholders. We refer to petitioners collectively throughout this opinion.

Petitioners process and sell a cannabinoid tincture called Universal Cannabis Tonic (UCT). Petitioners offer UCT in three different formulations and in three different sizes, including a small trial-size. In 2017, petitioners were packaging the trial-size of UCT in small vials with stopper caps, as follows:

> "There was no writing embossed on, or wrapped around, each glass vial. Each vial was glued to a folded piece of cardstock containing labeling information with a dab of fixed glue between the cap and the cardstock. The cardstock closed over the vial like a book, but it was not sealed shut."

Petitioners sought approval of that style of labeling in 2017, and, after discussions with OLCC, on June 7, 2017, OLCC approved that labeling.

In 2018, OLCC adopted new packaging and labeling rules. Those rules required that all labeling applications received on or after August 15, 2018, were subject to the new rules. However, the rules also allowed for a "sell-down period" of product from August 15, 2018, to March 31, 2019. Petitioners understood that, under the new rules, "products in packaging that had previously been approved by the Commission could be transferred from a processor to a dispensary up through March 31, 2019."

In July 2018, petitioners submitted a label application for its UCT product, including the trial-size, with the intention of complying with the new 2018 rules. The content of the cardstock label for the trial-size UCT differed from the 2017 labels in certain ways; however, how the labels were affixed to the trial-size vials remained the same— the cap of the vial was glued to the cardstock label. OLCC rejected the label for the trial-size UCT. Petitioners resubmitted its application in August 2018, which OLCC again rejected. OLCC's position was that the label was not affixed to the trial-size vial because the vial must be physically separated from the cardstock to use the product. In December 2018, petitioners resubmitted the trial-size UCT labels so that OLCC could issue a formal appealable denial.

In the meantime, between September 11, 2018, and March 31, 2019, petitioners transferred to marijuana retailers for sale approximately 34,741 vials of trial-size UCT products using a cardstock label that OLCC later found was the unapproved cardstock label petitioners submitted in 2018.

On April 16, 2019, OLCC issued its notice of proposed label denial, and petitioners requested a contested hearing. After postponements of the hearing, on January 21, 2020, OLCC issued an amended notice that included a proposed civil penalty along with the label denial. Ultimately, as relevant here, OLCC alleged that, between September 11, 2018, through March 31, 2019, petitioners transferred

34,741 trial-size UCT products without an approved label, contrary to the 2018 rules. That notice proposed a $100,000 civil penalty for petitioners' alleged labeling violations.

After a contested hearing before an Administrative Law Judge (ALJ), the ALJ issued a proposed order. Petitioners lodged exceptions to the proposed order, which were heard before the OLCC Board of Commissioners. OLCC rejected petitioners' exceptions and adopted the ALJ's proposed order as its final order. In brief, OLCC concluded that (1) petitioners' 2018 label applications were properly denied "because there was no label printed on or affixed to the container holding the marijuana item, as required by OAR 845-025-7030(1)(a) ([June 1,] 2018)"; (2) petitioners violated OAR 845-025-7160(1) (June 1, 2018) and OAR 845-025-7170(1), (3), and (4) (June 1, 2018), "on approximately 100 separate days from September 11, 2018, through March 31, 2019, when it sold to retail licensees for ultimate sale to a consumer approximately 34,741 trial-sized vials of *** UCT cannabinoid tincture with labels that had not received approval from [OLCC]"; and (3) it would assess a $100,000 civil penalty against petitioners for those violations.

Petitioners now seek judicial review of that final order under ORS 183.482, raising four assignments of error. We address each assignment of error below.

## II.  ANALYSIS

### A.  *Procedural Challenge*

We first address petitioners' fourth assignment of error because it raises a procedural challenge. That challenge is based on an exchange at the hearing before the OLCC Board of Commissioners on petitioners' exceptions to the proposed order. At that hearing, the OLCC case presenter stated that there had been a settlement offer to petitioners. The following exchange then occurred:

> "CHAIR ROSENBAUM:   And can you—I don't know if it's on or off the record, and Counsel may object, but could you tell us what that offer was?
>
> "[OLCC CASE PRESENTER]:   [Petitioners' counsel], do you object to me telling the Chair what the offer was?

"[PETITIONERS' COUNSEL]:   This is all a bit irregular because this is all outside the record and all prior to our involvement. I'm at a bit of a disadvantage here. I—I suppose that I don't object to talking about what the offer was, but the statements about what Mr. Goldberg and Mr. Schein may have discussed, bother me a bit. Go ahead and tell them what the settlement offer was, I don't object to that."

The case presenter then disclosed the amount of the settlement offer.

On judicial review, petitioners argue that soliciting the amount of the settlement offer, which was not in the record, was a material error in procedure because OAR 137-003-0655(5) provides the process in contested cases for introducing new evidence after issuance of a proposed order, which was not followed here. Petitioners further argue that the new evidence unfairly influenced the OLCC Board of Commissioners to adopt the proposed order.

We reject petitioners' argument because any procedural error was invited by petitioners. "Under the invited error doctrine, a party who was actively instrumental in bringing about an alleged error cannot be heard to complain, and the case ought not to be reversed because of it." *State v. Kammeyer*, 226 Or App 210, 214, 203 P3d 274, *rev den*, 346 Or 590 (2009) (internal quotation marks omitted). Here, when asked if he objected to the immediate disclosure of the settlement amount, petitioners' counsel acknowledged that the settlement amount was not in the record but affirmatively stated, "[g]o ahead and tell them what the settlement offer was." Having done so, petitioners were actively instrumental in causing the alleged error that they now complain about. *See id*. ("The goal of the [invited error] rule is to ensure that parties who make intentional or strategic trial choices do not later 'blame the court' if those choices prove to be unwise."). As a result, we decline to consider the merits of petitioners' argument.

B.  *Label Denial*

We next address petitioners' second assignment of error, which challenges OLCC's denial of the proposed card-stock labels for the trial-size UCT products. Petitioners set

out three arguments: OLCC's interpretation of the word "affixed" in OAR 845-025-7030(1)(a) (June 1, 2018), is erroneous; OLCC's final order lacks substantial reason; and OLCC's application of the labeling rule in this case is inconsistent with its prior practice. As explained below, we reject each of petitioners' arguments.

We begin with OLCC's interpretation of its own rule. Under ORS 183.482(8)(a), our task is to determine if "the agency has erroneously interpreted a provision of law." "An agency may determine whether the standard established in a rule has been met in a particular instance by interpreting the rule in the course of applying it." *Papas v. OLCC*, 213 Or App 369, 377, 161 P3d 948 (2007). "We defer to the agency's plausible interpretation of its own rule—including an interpretation made in the course of applying the rule—if that interpretation is not inconsistent with the wording of the rule, its context, or any other source of law." *Id*. (citing *Don't Waste Oregon Com. v. Energy Facility Siting*, 320 Or 132, 142, 881 P2d 119 (1994)). When determining the plausibility of an agency interpretation, we apply our usual methodology and consider the text of the rule in its statutory and regulatory context. *Tualatin Riverkeepers v. DEQ*, 235 Or App 132, 144, 230 P3d 559, *rev den*, 349 Or 173 (2010) (explaining that we apply the same analytical framework that we apply to the construction of statutes).

The labeling rule at issue here, OAR 845-025-7030(1)(a) (June 1, 2018),[1] provided:

"(1)   A label required by these rules must:

"(a)   Be printed on or affixed to the container holding the marijuana item or industrial hemp commodity or product and printed on or affixed to any outer package or container that is used to display the marijuana item or industrial hemp commodity or product for sale or transfer to a consumer, patient or designated primary caregiver[.]"

---

[1] We apply the labeling rule that was in effect at the time of petitioners' label application. Since that time, OAR 845-025-7030 has been amended several times. We note, however, that the current version of OAR 845-025-7030(1)(a) is identical to the June 1, 2018, rule with the exception that the phrase "marijuana item or industrial hemp commodity or product" in the 2018 rule now reads "marijuana item or hemp item." *Compare* OAR 845-025-7030(1)(a) (June 1, 2018), *with* OAR 845-025-7030(1)(a) (Jan 1, 2025).

In the final order, OLCC interpreted "affixed" in that rule to mean "a secure and firm attachment, such that the label is unlikely to fall off or be removed during transport or normal use of the product."

Petitioners argue that OLCC's interpretation is not plausible because the word "affix" simply means to physically attach. They assert that OLCC's interpretation inserts words and concepts into the rule that would require a rulemaking to establish. Petitioners also argue that the context demonstrates that "affixed" in OAR 845-025-7030(1)(a) (June 1, 2018) was not intended by OLCC to mean "a secure and firm attachment" because OLCC has promulgated other rules that expressly use the term "securely affixed" when that is what is meant.

OLCC, for its part, argues that its interpretation is plausible because it is based on the plain meaning of the word "affixed," citing to dictionary definitions. It also asserts that the interpretation is consistent with the context and purpose of the rule, which in turn is consistent with the label requirements in the statutes.

We conclude that OLCC's interpretation of its own rule is plausible. The issue here largely centers on OLCC's use of the word "affixed" in OAR 845-025-7030(1)(a) (June 1, 2018), which is not defined by statute or rule. When a word is not defined by statute or rule, we often turn to dictionary definitions to aid in our understanding of the plain and ordinary meaning of the word. *Central Oregon Landwatch v. Deschutes County*, 276 Or App 282, 290, 367 P3d 560 (2016). As relevant in the context of affixing a label to an item, "affix" is defined as "to attach physically (as by nails or glue) : FASTEN—usually used with *to* \*\*\* <*affix* the label to the package>." *Merriam-Webster's Unabridged Dictionary*, http://unabridged.merriam-webster.com/unabridged/affix (accessed Oct 22, 2025). In turn, "attach" is defined as "make fast or join (as by string or glue) : BIND, FASTEN, TIE <*attach* price tags on each article>." *Merriam-Webster's Unabridged Dictionary*, http://unabridged. merriam-webster.com/unabridged/attach (accessed Oct 22, 2025). Further, "fasten" is similarly defined as "to cause to hold to something else : attach especially by pinning, tying, or nailing" and "to cause (parts which are separate)

to hold together **:** make fast and secure." *Merriam-Webster's Unabridged Dictionary,* http://unabridged.merriam-webster.com/unabridged/fasten (accessed Oct 22, 2025). Based on those definitions, the plain meaning of affix, in this context, is to physically attach or join something to something else. The definitions also include the concepts that the attachment is secure, such that it remains joined. That is conveyed by detailing that the attachment is usually by glue or nails and through the examples of labels on packages and price tags on articles. Petitioners would have us read the definition for affix as "physically attach" and stop there. However, that would require us to ignore the full concept of "affix" as conveyed through the relevant dictionary definitions.

A dictionary definition is not the end of our inquiry. Although those definitions aid us in understanding the plain meaning of words, we must also consider the words in the context in which they are used. *Central Oregon Landwatch,* 276 Or App at 190-91. Here, the direct context is that the rule requires that a label must "[b]e printed on or affixed to the container holding the marijuana item." That context suggests that an affixed label must be secure and not easily removed, because the rule equates printing a label directly onto the container (a permanent labeling) with affixing a separate label onto the container. OLCC's interpretation is consistent with how the words are used in the context of the rule.

We also consider the broader statutory and regulatory context. The statutory context is provided by *former* ORS 475B.605 (2017), *renumbered as* ORS 475C.604 (2021), which addresses labeling requirements for marijuana items.[2] That statute provides that the purpose of the labeling requirements is to protect the public health and safety by ensuring that marijuana products sold for retail are labeled with the required information. *See former* ORS 475B.605(1)(a) (2017) ("As is necessary to protect the public health and safety,

_____

[2] We cite to the statute in effect at the time OLCC enacted OAR 845-025-7030(1)(a) (June 1, 2018). However, we note that the cited portions of *former* ORS 475B.605 (2017) are identical to the current version of the statute, ORS 475C.604, with the exception that "inhalant delivery systems that contain industrial hemp-derived vapor items" are now also explicitly included as items covered by the labeling requirements.

\*\*\* [OLCC] shall adopt rules establishing standards for the labeling of marijuana items, including but not limited to \*\*\* [e]nsuring that usable marijuana, cannabinoid concentrates and extracts, cannabinoid edibles, and other cannabinoid products have labeling that communicates [certain required information].”); *former* ORS 475B.605(3) (2017) (requiring OLCC to require that marijuana items sold or transferred by a marijuana retailer are labeled in accordance with subsection (1) and OLCC's rules); *former* ORS 475B.605(4)(d) (2017) (providing that OLCC “[m]ay not adopt rules that are more restrictive than is reasonably necessary to protect the public health and safety”). OLCC's interpretation is consistent with that statutory purpose. The public health and safety purpose of the labeling requirement would not be met by labels that are not securely attached to marijuana items, such that the label was likely to fall off or be removed during transport or normal use.

The regulatory context provides only slight additional illumination. An OLCC rule provides that the purpose of the labeling rules “is to set the minimum standards for the packaging and labeling of marijuana items \*\*\* that are for ultimate sale or transfer to a consumer \*\*\*.” OAR 845-025-7010(1). OLCC's interpretation of affix as requiring a firm and secure attachment is consistent with that general purpose and its other labeling requirements. Petitioners, however, assert that in two instances OLCC has used the term “securely affixed” in its rules and, with that context, “affixed” must mean something other than securely affixed. We are not persuaded that those two instances of using the term “securely affixed” by OLCC in sections of the marijuana regulations that are not part of the labeling rules renders implausible what is otherwise a plausible interpretation by OLCC.[3]

---

[3] Petitioners cite to OAR 845-025-2880(4)(h) and OAR 845-025-3305(2)(a). The first rule addresses delivery of marijuana items and requires that “[a]ll marijuana items must be kept in a lock-box securely affixed inside the delivery motor vehicle.” OAR 845-025-2880(4)(h) (Dec 28, 2017). That rule does not provide useful context for the labeling rule at issue here. The second rule addresses labeling requirements for marijuana items processed directly for a cardholder and that are not for retail sale. That rule as it existed in 2018 when OLCC promulgated the rule at issue in this case did not use the term “securely affixed.” Instead, it simply provided that the processor must “label the package” with the required statements. OAR 845-025-3305(2)(a) (Dec 28, 2017). In December 2018, OLCC

Based on the text and context, we conclude that OLCC's interpretation of OAR 845-025-7030(1)(a) (June 1, 2018) to require "a secure and firm attachment, such that the label is unlikely to fall off or be removed during transport or normal use of the product" is plausible and due deference.

We thus proceed to address whether OLCC's final order was based in substantial reason when it concluded that petitioners' proposed labels did not meet the affixed requirement in OAR 845-025-7030(1)(a) (June 1, 2018). For its order to be supported by substantial reason, "the agency must articulate a 'rational connection between the facts and the legal conclusions it draws from them.'" *Jenkins v. Board of Parole*, 356 Or 186, 195, 335 P3d 828 (2014) (quoting *Ross v. Springfield School Dist. No. 19*, 294 Or 357, 370, 657 P2d 188 (1982)).

Petitioners argue that OLCC's conclusion lacks substantial reason because it conflicts with finding of fact 38 in the order, which details an exchange with petitioners and Anthony Geltosky, OLCC's packaging and labeling specialist, about the labels, and the testimony of Geltosky at the contested hearing, without explaining that conflict.

We reject petitioners' argument. In the final order, OLCC concluded that it had shown

> "that a reasonable cannabis consumer would likely remove the cardstock label from the container (*i.e.*, vial) of marijuana product during (or before) normal use of the product. And, because the record persuasively establishes that the trial-sized UCT vials are not intended to be single-dose or single-serving size, the likely removal of the cardstock label from the vial will result in a completely unlabeled vial of marijuana product, which constitutes a public safety concern."

OLCC then provided additional rational explanation that connected its findings with its legal conclusions that petitioners' proposed label did not meet the rule requirement that it be affixed to the container.

---

amended that rule to provide that the processor must "securely affix a label that contains the following information." OAR 845-025-3305(2)(a) (Dec 28, 2018). As a result, that rule also does not provide useful context of OLCC's intent when it promulgated the rule at issue here.

The finding and testimony referenced by petitioner are not in conflict with that explanation and petitioners do not explain their position. Instead, in their opening brief, petitioners modified a quotation from the transcript with well-placed ellipses to make it appear that Geltosky testified that the proposed cardstock label qualified as a label under the rules. That was not his testimony. His testimony was in response to a question by the ALJ whether the proposed cardstock label was itself a container under the rules, and he testified that "I would consider it more akin to a flag or a hand-tag label—that our rules allow for if the container itself that's holding the marijuana item meets certain minimum requirements." That testimony does not demonstrate that OLCC's order lacked substantial reason. Further, OLCC was not required to explain its decision with respect to each line of testimony or each piece of evidence submitted. *See D. T. v. Dept. of Human Services*, 247 Or App 293, 304 n 5, 269 P3d 96 (2011) ("The 'substantial reason' test does not require an agency to expressly reject each of a petitioner's arguments or recount all the evidence that the agency considered; rather, it requires that an agency adequately explain 'the *reasoning* that leads \*\*\* from the *facts* that it has found to the *conclusions* that it draws from those facts.'" (Quoting *Drew v. PSRB*, 322 Or 491, 500, 909 P2d 1211 (1996) (emphases in *Drew*).)).

Finally, we address petitioners' contention that OLCC's decision in this case was inconsistent with its approval of other labels that were placed into evidence. Petitioners' argument centers on two labels for products purchased at a marijuana dispensary that they put into evidence at the hearing—one for a fudge bar and one for a chocolate bar. They asserted that normal use of those products, which were more than one serving, left the remaining unused portion unlabeled and, thus, the approved labels were not securely affixed to the container containing the marijuana item. Petitioners assert that the inconsistent treatment of petitioners' proposed labels in this case requires reversal and remand for an explanation addressing the inconsistency.

Under ORS 183.482(8)(b)(B), we will remand an order to an agency if we conclude that an agency's exercise

of discretion is "[i]nconsistent with an agency rule, an officially stated agency position, or a prior agency practice, if the inconsistency is not explained by the agency[.]" In reviewing an order for consistency, we review "to determine if the [agency's] findings, reasoning, and conclusions demonstrate that it acted in a rational, fair, and principled manner in deciding" petitioners' case. *Gordon v. Board of Parole*, 343 Or 618, 634, 175 P3d 461 (2007).

Here, we question whether petitioners have identified a relevant prior agency practice that is inconsistent with OLCC's decision in this case. Petitioners put into evidence two candy bars that in normal use could result in an unused amount being unlabeled; they have not explained how that labeling is a relevant prior practice given the dissimilarity of the products. Regardless, in its findings in the final order, OLCC included its position, as explained by Geltosky, for treating chocolate bars differently from petitioners' product. He explained:

> "[T]he chocolate bar is capable of being relabeled and [petitioners'] product is not. A chocolate bar will come packaged in a fully labeled container that protects the bar. Typically, when a consumer removes the bar from the packaging, he or she has the option to put the bar back in its original packaging. To remove the bar, have a single serving, and leave the bar unpackaged is irresponsible. It is also unlikely because the longer a chocolate bar is exposed to air, the more it oxidizes. In this scenario, the consumer has the convenient option to be responsible by placing the bar back in its packaging. In [petitioners'] scenario, the consumer cannot physically reattach the vial to the labeling without glue or tape and must go through extra steps to be responsible. These extra steps increase the risk of unintended ingestion."

Thus, OLCC did explain any inconsistency in its treatment of labels for marijuana fudge or chocolate bars and petitioners' product. *See Thomas Creek Lumber and Log Co. v. Board of Forestry*, 188 Or App 10, 24, 69 P3d 1238 (2003) (rejecting argument for remand based on unexplained inconsistency with prior agency practice where the agency did provide an explanation for its different action).

We thus affirm OLCC's denial of petitioners' proposed cardstock labels for its trial-size UCT products.

## C. *Label Violations*

We next address petitioners' first assignment of error, which challenges OLCC's determination that petitioners violated OAR 845-025-7160(1) (June 1, 2018)[4] and OAR 845-025-7170(1), (3), and (4) (June 1, 2018),[5] "on approximately 100 separate days from September 11, 2018, through March 31, 2019, when it sold to retail licensees for ultimate sale to a consumer approximately 34,741 trial-sized vials * * * with labels that had not received approval from [OLCC]." OLCC based that conclusion on its finding that the labels used for the trial-size UCT that petitioner had transferred for sale during that period were the labels that petitioners had submitted for approval in 2018 that OLCC denied. Petitioners again raises two arguments: OLCC erroneously applied the 2018 labeling rules because those rules did not apply to product sold before April 1, 2019, and OLCC's order lacks substantial reason. As explained below, we reject both of those arguments.

When OLCC promulgated the June 2018 labeling rules, it provided in OAR 845-025-7190 (June 1, 2018) for a sell-down period during which products transferred for sale did not have to comply with the new packaging and labeling rules. As relevant here, OAR 845-025-7190 (June 1, 2018) provided:

"(1)   These rules become effective on August 15, 2018. On and after August 15, 2018, all package and label

---

[4] OAR 845-025-7160(1) (June 1, 2018) provided:

"Prior to selling, offering for sale, or transferring a marijuana item or industrial hemp commodity or product that is for ultimate sale to a consumer, a licensee, a license applicant or a registrant must submit both a package and a label application to and receive approval from the [OLCC]."

[5] OAR 845-025-7170(1), (3), and (4) (June 1, 2018) provided:

"The Commission may impose a civil penalty of up to $500 per day per violation for any of the following:

"(1)  Failure to comply with these rules.

"* * * * *

"(3) Failing to receive package and label approval prior to transferring, selling, or offering for sale a marijuana item or industrial hemp commodity or product that is for ultimate sale to a consumer.

"(4) Transferring, selling or offering for sale a marijuana item or industrial hemp commodity or product that has not received package or label approval."

applications received by the Commission will be reviewed and evaluated under these rules.

"(2)  All marijuana items and industrial hemp commodities and products packaged or transferred for sale to a consumer on or after April 1, 2019 must be labeled and packaged according to these rules."

Before the ALJ, petitioners argued that labels were subject to the 2017 labeling rules through the sell-down period, which ended March 31, 2019, and not the 2018 rules cited by OLCC in its violation notice, and, as a result, OLCC's notice was defective. In the final order, OLCC rejected that argument, interpreting the 2018 rules as they apply to processors as follows:

"Labels approved prior to August 15, 2018 and sold through the March 31, 2019 sell-down period were not subject to the labeling and packaging requirements of the 2018 new rules package. However, labels that were *not* approved prior to August 15, 2018, and that were nonetheless sold through March 31, 2019, were not afforded that same exclusion from the 2018 labeling and packaging requirements. Similarly, any label application received on or after August 15, 2018 was subject to review and evaluation under the 2018 labeling and packaging requirements."

(Emphasis in original.) On judicial review, petitioners challenge that interpretation as contrary to the text of OAR 845-025-7190 (June 1, 2018) and the testimony of one of OLCC's witnesses.

In addressing OLCC's interpretation of its own rule, under ORS 183.482(8)(a), our task is to determine if "the agency has erroneously interpreted a provision of law." "We defer to the agency's plausible interpretation of its own rule—including an interpretation made in the course of applying the rule—if that interpretation is not inconsistent with the wording of the rule, its context, or any other source of law." *Papas*, 213 Or App at 377. We again apply our usual methodology and consider the text of the rule in its statutory and regulatory context. *Tualatin Riverkeepers*, 235 Or App at 144. Applying that methodology, we conclude that OLCC's interpretation is plausible and due deference.

As relevant here, the plain terms of OAR 845-025-7190 (June 1, 2018) did two things: the rule made the 2018 labeling rules effective on August 15, 2018, and it provided a window until March 31, 2019, to sell products that did not have 2018-compliant packages and labels. However, and importantly, the sell-down period did not provide a blanket exemption from the August 15, 2018, effective date of the 2018 labeling rules. Although the sell-down period deferred compliance with the labeling and packaging requirements for sold product, it did not defer compliance with the label preapproval requirements (or defer the effective date of the civil penalty rule enforcing that requirement). OAR 845-025-7190(1) (June 1, 2018) expressly provided that preapproval applications submitted after August 15, 2018, would be evaluated under the 2018 rules.[6] It is the preapproval requirement that OLCC concluded petitioners had violated.

OLCC's interpretation of OAR 845-025-7190(1) (June 1, 2018), set out above, is consistent with the rule's plain text. Additionally, we perceive nothing in the regulatory or statutory context that is inconsistent with OLCC's interpretation, and petitioners point to none.

We also reject petitioners' apparent argument that OLCC could not apply the interpretation of OAR 845-025-7190 (June 1, 2018) that appears in the final order, because it was not an interpretation offered by OLCC witnesses at the contested case hearing before the ALJ. Contrary to petitioners' assertion, OLCC is free to adopt as its own an ALJ's interpretation in a proposed order. That is what OLCC did in this case when the Board of Commissioners rejected petitioners' exceptions to the ALJ's proposed order and adopted it as OLCC's final order. When we give deference to an agency interpretation of its own rules, we are giving deference to interpretations by those at the agency who have policy-making authority. *See, e.g.*, *Clardy v. Gangitano*, 334 Or App 213, 221-22, 556 P3d 642, *rev den*, 373 Or 154 (2024) (stating that deference "applies only to interpretations rendered by agency personnel who possess interpretive authority"); *OR-OSHA v. Loy Clark Pipeline Co.*, 320 Or App 205,

---

[6] We also note that petitioners do not dispute that the label preapproval requirement predated the 2018 labeling rules.

210, 514 P3d 544, *rev den*, 370 Or 471 (2022) ("[D]eference is owed only to the authority that promulgated the rule, not to interpretations by those without policy-making authority."). The OLCC Board of Commissioners is the policy-making authority for OLCC and the interpretation in the final order is its interpretation. *See* ORS 471.705(1) (OLCC consists "of nine commissioners appointed by the Governor"); ORS 471.720 (the OLCC administrator "shall be subject to policy direction by the commissioners"); ORS 475C.017 (setting out powers and duties of OLCC with respect to marijuana regulation). OLCC was not required to explain why its interpretation of its own rule differed from the opinion of a staff witness that appeared at the contested case hearing.

Finally, we reject petitioners' substantial reason challenge. For an order to be supported by substantial reason, "the agency must articulate a rational connection between the facts and the legal conclusions it draws from them." *Jenkins*, 356 Or at 195 (internal quotation marks omitted).

Here, OLCC determined that petitioners violated the 2018 labeling rules by transferring products for sale with unapproved labels after August 15, 2018—specifically, between September 11, 2018, and March 31, 2019. That determination was based on OLCC's findings of fact that the labels used on the products transferred between those dates were not the same labels that OLCC approved for petitioners' trial-size UCT product in 2017 and, instead, that the labels were the same labels that OLCC had denied approval for in 2018.[7] OLCC did articulate a rational con-

---

[7] OLCC found:

"From September 11, 2018 through March 31, 2019, [petitioners] transferred approximately 34,791 trial-sized vials of its UCT cannabis tincture to licensed retailers for sale to consumers. The folded cardstock labels accompanying those trial-sized vials differed from any previously approved trial-sized cardstock labels in the following ways:

"1) the product identity was listed as a 'Cannabinoid Tincture;'

"2) the lettering of the product identity was in bold font;

"3) the product identity was located in approximately the middle of the front cardstock page;

"4) [petitioners'] license number was on the back cardstock page;

"5) the driving warning stated, 'Do not drive a motor vehicle while under the influence of marijuana;'

nection between the facts it found and its legal conclusions, having explained:

> "The trial-sized UCT vials that [petitioners] ultimately transferred for sale during the period September 1[1], 2018 through March 31, 2019 had labels that differed in eight ways from the previously approved 2017 trial-sized labels. Contrary to [petitioners'] repeated assertions, the trial-sized labels that [petitioners] sold during the sell-down period were not the previously approved trial-sized labels with simply a new product identification and two or three inadvertent and insignificant changes. In fact, the trial-sized UCT labels that [petitioners] sold from September 11, 2018 through March 31, 2019 were the very labels that [petitioners] had submitted for OLCC approval in July 2018 (with the intention that they be reviewed under the 2018 rules), August 2018, and December 2018—labels which OLCC denied."

(Emphasis omitted.)

On judicial review, petitioners argue that OLCC's order lacks substantial reason because it does not square with petitioners' preferred interpretation of OAR 845-025-7190 (June 1, 2018) and finding of fact 15. We reject that argument because OLCC's interpretation of that rule is plausible and entitled to deference. Additionally, we see nothing in finding of fact 15 that supports petitioners' argument that OLCC's order lacks substantial reason.[8]

Petitioners also articulate for the first time on judicial review that the final order lacks substantial reason

---

> "6) the caution language stated, 'Cannabinoid products can take up to 2 hours or more to take effect;'

> "7) the first listed ingredient was 'Cannabis flower;' and

> "8)  there was no nutritional information listed."

(Footnote and record citations omitted.) OLCC also found that "[t]he trial-sized UCT cardstock labels that Mr. Geltosky observed on April 17, 2019 at the three retail stores were all materially the same as the trial-sized cardstock labels that [petitioners] had submitted for OLCC approval in July, August, and December 2018."

[8] Finding of fact 15 provides:

> "The new rules create a special 'sell-down' period from August 15, 2018 to March 31, 2019, applicable to processors such as [petitioners]. (Test. of Sweet and Dickinson; *see* OAR 845-025-7190(2); *see also* Ex. A40.) The sell-down period was not intended to allow a processor to sell labels that were non-compliant with, and not approved under, the former rules. (*See* test. of Sweet.)"

because the order merely assumes that the changes to the labels negated petitioners' 2017 label approval, without conducting an analysis under the 2017 rules to determine whether those changes would have been permitted by those rules.[9] Even setting aside the lateness of petitioners' articulation of that argument, we reject it as insufficiently developed. Petitioners do not cite to any 2017 rules at all, let alone rules that demonstrate that the unapproved changes they made to their labels were permitted by their 2017 label approval. Instead, in their reply brief, petitioners cite to OAR 845-025-7160(7) (June 1, 2018),[10] a rule they assert would allow the changes they made to the labels without resubmittal for approval, and then state, "[i]t stands to reason that if the 2018 rules allow certain non-material changes to previously approved labels without requiring re-approval, the prior rules likely did as well." As to the 2018 rule, petitioners do not explain how OLCC's decision lacks substantial

---

[9] Petitioners assert that they raised this issue in their exceptions to the ALJ's proposed order that they presented to the OLCC Board of Commissioners. We conclude, however, that petitioners did not raise this issue. In the exceptions, petitioners argued that the changes to the labels were changes that the 2018 rules allowed without resubmittal, specifically OAR 845-025-7160(7) (June 1, 2018). Petitioners did not directly argue, making only a passing statement in that direction in a footnote, that OLLC was required to evaluate their labels under the 2017 rules to determine if they were approved labels, despite the changes made to the labels. And, more importantly, petitioners never identified any 2017 rules that supported their position that the labels were approved, despite the changes.

[10] OAR 845-025-7160(7) (June 1, 2018) provides:

"Packages and labels that have been previously approved do not need to be resubmitted if the only changes to the packaging or label are:

"(a) Changes in the:

"(A) Harvest or processing date;

"(B) Strain;

"(C) Test results;

"(D) Net weight or volume; or

"(E) UID numbers.

"(b) The deletion of any non-mandatory label information.

"(c) The addition, deletion or change in the:

"(A) UPC barcodes or 2D mobile barcodes (QR codes);

"(B) Website address, phone number, fax number, or place of address of the licensee or registrant; or

"(C) Instructions for opening or using child-resistant packages.

"(d) The repositioning of any label information on the package, as long as the repositioning of label information is consistent with these rules."

evidence or contains legal error when it rejected petitioners' argument that the changes were permissible under the 2018 rule without resubmittal of the label, which was the argument petitioners made in their exceptions to the ALJ's proposed order. As the 2017 rule, petitioners' speculation about the likely effect of an unspecified 2017 rule does not demonstrate that OLCC's final order lacks substantial reason, particularly when petitioners failed to raise that argument below.

OLCC's final order articulates a rational connection between the facts it found and its legal conclusions. Petitioners have not challenged any of OLCC's findings of fact as lacking substantial evidence, including OLCC's findings that the labels were not the 2017 approved labels, but were, in fact, the 2018 labels that OLCC rejected. Nor have petitioners explained a basis on which we could conclude that OLCC's order lacks substantial reason.

We thus reject petitioners' first assignment of error.

D.    *Penalty Amount*

Finally, we address petitioners' third assignment of error. In that assignment petitioners argue that OLCC exceeded its discretion in imposing a $100,000 penalty for the labeling violations because that amount is not authorized by *former* ORS 475B.655(1) (2017), *renumbered as* ORS 475C.644(1) (2021).[11] Because petitioners' assignment is grounded in their contention that *former* ORS 475B.655(1) (2017) compels a particular method for calculating a penalty, we review for an error of law. *See* ORS 183.482(8)(a) (providing that a court may reverse or remand an agency order "[i]f the court finds that the agency has erroneously interpreted a provision of law and that a correct interpretation compels a particular action"); *Springfield Education Assn. v. School Dist.*, 290 Or 217, 227, 621 P2d 547 (1980) ("The dispositive question of law on review, under this section, is whether the agency action is within the legislative policy which inheres in the statutory term.").

---

[11] We cite to the version of the penalty statute in effect at the time of petitioners' alleged violations. However, we note that *former* ORS 475B.655 (2019) is substantively identical to the current version of the statute, ORS 475C.644.

In the final order, based on OLCC written policy, OLCC concluded that petitioners' violations were Category III violations, which were subject to a penalty of $400 per day per violation, with the total penalty amount capped at $100,000. OLCC determined that the $400 per day per violation applied to each of the 34,741 items transferred with unapproved labels.

On judicial review, petitioners argue that, under *former* ORS 475B.655(1) (2017), OLCC could not assess the penalty on a per unit basis. They argue that the plain text provided that the metric for civil penalties is the number of days a violation occurs and not the number of units involved in the violation. As a result, petitioners assert that the maximum penalty that could be imposed is $35,200 (88 days times $400).

We are thus required to determine whether, under *former* ORS 475B.655(1) (2017), OLCC could assess the penalty as it did. That statute provided that OLCC "may impose for each violation of a provision of ORS 475B.600 to 475B.655, or a rule adopted under a provision of ORS 475B.600 to 475B.655, a civil penalty that does not exceed $500 for each day that the violation occurs."[12] Nothing in ORS chapter 475B provided further guidance on what constitutes "the violation" that can be assessed "each day."

However, OLCC has promulgated a rule specific to assessing penalties for labeling violations. The version of the rule that applied at the time of petitioners' violations provided:

"The Commission may impose a civil penalty of up to $500 per day per violation for any of the following:

"(1)	Failure to comply with these rules.

"*****

"(3)	Failing to receive package and label approval prior to transferring, selling, or offering for sale a marijuana

---

[12] Similarly, OLCC's then-applicable general penalty rule provided that OLCC "may impose for each violation of a provision of *** OAR 845-025-7000 to 845-025-7190, a civil penalty of no more than $500 for each day the violation occurs." OAR 845-025-8590(2) (Dec 28, 2018).

item or industrial hemp commodity or product that is for
ultimate sale to a consumer.

"(4)  Transferring, selling or offering for sale a mari-
juana item or industrial hemp commodity or product that
has not received package or label approval."

OAR 845-025-7170 (June 1, 2018). That rule, by its plain
terms, permits a civil penalty "per day per violation," with a
violation including a failure to receive approval before sell-
ing "a marijuana item." In the final order, OLCC cited that
rule and applied the rule's plain text when it determined
that a penalty could be assessed for each violation—the
34,741 items transferred with unapproved labels—which
triggered the $100,000 penalty cap.

On judicial review, petitioners fail to address the
text of OAR 845-025-7170 (June 1, 2018) or explain how
OLCC's application of that rule here is inconsistent with
*former* ORS 475B.655(1) (2017), besides simply stating that
it is. We will not make arguments for petitioners that they
have failed to make for themselves. We are not persuaded
that OLCC's application of OAR 845-025-7170 (June 1,
2018) is inconsistent with the plain text or legislative policy
expressed in *former* ORS 475B.655(1), and we reject peti-
tioners' third assignment of error.

As a result, we affirm OLCC's final order.

Affirmed.